No. 02-311

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 257

IN THE MATTER OF H.E.,

Youth in Need of Care.

APPEAL FROM:     District Court of the Thirteenth  Judicial District,
                 In and for the County of Yellowstone,
                 The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

               Nancy L. Wetherelt, Attorney at Law, Billings, Montana (for natural Mother)

               Kevin Gillen; Gillen Law Office, Billings, Montana (for natural Father)

        For Respondent:

               Hon. Mike McGrath, Attorney General; Jennifer Anders, Assistant
               Attorney General, Helena, Montana

                                              Submitted on Briefs:  October 17, 2002

                                              Decided:  November 21, 2002

Filed:

        _____
                            Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1    The Thirteenth Judicial District Court, Yellowstone County, terminated the parental rights of H.E.'s mother and father.  Both parents appealed, but the father's counsel has  moved to be allowed to withdraw on the basis that there are no nonfrivolous grounds for his appeal.  We grant the motion of the father's counsel, dismiss the father's appeal and affirm the termination of the mother's parental rights.

¶2    We address the following issues:

¶3    1.   Are there nonfrivolous grounds to support the father's appeal?

¶4    2.   Did the District Court abuse its discretion when it implicitly denied the mother's motion to continue the permanent custody hearing or, in the alternative, to grant an extension of temporary legal custody for six months to allow the Department to conduct a home study on the woman the parents proposed for foster care placement of H.E.?

## BACKGROUND

¶5    H.E. was born in Billings, Montana, on April 24, 2001. Because both of her parents were incarcerated at the Yellowstone County Detention Facility pending resolution of federal felony drug charges, H.E. was placed in foster care when she was one day old.

¶6    In May of 2001, the District Court adjudicated H.E. a youth in need of care and granted the Department of Public Health and Human Services (Department) temporary legal custody for six months.  The

2

Department subsequently moved for permanent custody and termination of both parents' rights.

¶7 At the start of the permanent custody hearing in November of 2001, the mother moved to continue the hearing or, in the alternative, to grant the Department an extension of temporary legal custody so it could conduct a home study of Jimmie Sue Helzer, a woman proposed by the parents as a temporary placement for H.E., until the mother's release from incarceration. The District Court questioned Pam Weischedel, the Department social worker assigned to the case, who stated she had learned of the parents' proposal for placement with Helzer only after she had placed H.E. in foster care. The court decided to proceed with the hearing, and to consider the motion and the proposed placement after hearing the evidence.

¶8 A federal probation officer was the first witness. He testified that the father, whose felony criminal record extended back to 1988, would not be released from federal custody for seven to eight years. According to the officer, the mother was scheduled to complete a state prison sentence on a probation revocation in April of 2002, and then would begin serving a 60-month federal prison sentence.

¶9 Weischedel testified that child protective services had removed the mother's three older children from her custody before H.E. was born. She testified she had originally planned to place H.E. in emergency foster care until the situation regarding the criminal charges against the parents was resolved, but it became

3

clear very early on that both parents would be sentenced to extensive time in prison. Because both parents told her that they did not want H.E. placed in an adoptive home, Weischedel considered a family placement. However, neither the father nor the mother identified a family member able and willing to care for H.E. and, as a result, Weischedel placed H.E. in foster care with a couple willing to adopt her.

¶10 Weischedel further testified she had offered the mother and the father two treatment plans each, but neither parent was able to complete a treatment plan. The father provided verification of having taken a parenting class, but "didn't do most of the tasks on the treatment plan." The mother did not complete chemical dependency treatment or provide verification that she had completed a parenting class.

¶11 Weischedel also testified the mother had told her she was making plans for H.E. through a church group. At some time after H.E. was placed in foster care, Weischedel received a copy of a letter the father had written to the District Court--but which is not in the District Court file--proposing Helzer, who the mother met while in prison, as a temporary foster care placement for H.E. until the mother's release. Helzer did not contact Weischedel and Weischedel did not do any background checks on Helzer. Weischedel testified she had been very clear with both parents that, under the law, they must be able to parent H.E. within one year or H.E. would be placed in an adoptive, permanent home.

¶12 Weischedel's written report dated August 14, 2001, also was before the court. The report detailed both parents' arrest

4

records, the mother's history with child protective services and the removal of her three older children from her care. The mother's history of drug use included stealing morphine prescribed for her own mother, who was dying of brain cancer. The mother was pregnant with H.E. when she was arrested on federal charges of possession with intent to distribute methamphetamine, cocaine, and marijuana. She tested positive for methamphetamine, cocaine and marijuana at that time.

¶13 LaVain Frank, who was involved in prison ministry, testified the mother had been attending his Monday night church services at the women's prison. He testified both parents had told him they wanted H.E. placed with Helzer. Frank acknowledged, however, that he would not recommend a child wait until age three to start being cared for by a parent who is unavailable until that time. Furthermore, he opined that it would be better for H.E. to stay in her current foster care rather than move to Helzer's home and then move again when the mother is released from prison.

¶14 Helzer testified that she was a fellowship volunteer at the prison and had met the mother in a Bible studies group. She expressed her willingness to care for H.E. on a short- or long-term basis, but confirmed that she had neither contacted the Department to seek approval as a foster care parent nor ever met H.E.

¶15 The mother also testified. She described her unsuccessful efforts to get into a federal prison program which allows new babies to stay with their mothers in prison for up to nine months. She testified that although she had serious drug problems in the

5

past--having used marijuana, cocaine, LSD, and crank--she had hit bottom after her arrest on the federal charges and everything had changed for her. She had been having weekly visits with H.E. at the women's prison.

¶16 The father, who was incarcerated in a federal prison in another state, was not able to participate in the hearing in person and chose not to participate via telephone. His counsel was present, however.

¶17 H.E.'s guardian ad litem recommended termination of both parents' rights to H.E. He opined that, given the mother's "difficult past," he would not be willing to risk H.E.'s future welfare and well-being by an interim placement.

¶18 The District Court entered findings of fact, conclusions of law and an order terminating both parents' rights to H.E. As part of its decision, the court found it would not be in H.E.'s best interests to place her in foster care with Helzer until the mother's release from prison. In so doing, the court effectively denied the mother's motion for a continuance or extension of time.

DISCUSSION

¶19 1. Are there nonfrivolous grounds to support the father's appeal?

¶20 Under very limited circumstances, appointed counsel on appeal may seek to withdraw from further representation without denying an indigent client the fair representation guaranteed by the constitution. If, after the notice of appeal is filed and the client's right to an appeal is protected, counsel concludes that no nonfrivolous issues exist in the appeal, counsel may seek leave to

6

withdraw. *Anders v. California* (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493. Counsel must file a supporting brief referring to anything in the record that might arguably support the appeal. *Anders*, 386 U.S. at 744, 87 S.Ct. at 1400, 18 L.Ed.2d at 498.

¶21 In the present case, the father's counsel moved to withdraw and filed a brief in support of his motion pursuant to *Anders.* We gave the father time to respond to his counsel's motion, but he did not do so. The next step is for this Court to conduct a full examination of all the proceedings to decide whether the appeal is wholly frivolous. *See Anders*, 386 U.S. at 744, 87 S.Ct. at 1400, 18 L.Ed.2d at 498. If we so decide, we grant counsel's motion and dismiss the appeal. *See Anders*, 386 U.S. at 744, 87 S.Ct. at 1400, 18 L.Ed.2d at 498.

¶22 The father's counsel suggests that the father may wish to argue on appeal that the evidence is insufficient to support termination of his parental rights. We have reviewed the record and it reveals no potential nonfrivolous issues for the father to raise on appeal. Therefore, pursuant to *Anders*, we grant the motion of the father's counsel to withdraw and dismiss the father's appeal.

¶23 2. Did the District Court abuse its discretion when it implicitly denied the mother's motion to continue the permanent custody hearing or, in the alternative, to grant an extension of temporary legal custody for six months to allow the Department to conduct a home study on the woman the parents proposed for foster care placement of H.E.?

¶24 The mother argues that, by denying her motion for a continuance or extension of time, the District Court deprived her

7

of fundamentally fair procedures. She states that, when parents are unable to care for their children but guardianship placement options such as proposed by H.E.'s parents are available, those options should be reviewed prior to placing the child with foster parents willing to adopt the child. The mother relies on § 41-3-440, MCA, which provides that the Department shall determine the appropriate placement for a child alleged to be a youth in need of care "in the absence of a dispute between the parties to the action regarding the appropriate placement[.]"

¶25 A trial court's decision on whether to grant a continuance in an abuse and neglect action is a matter of discretion. The court should consider whether the movant has shown good cause and whether the continuance would be in the furtherance of justice. *In re R.F.*, 2001 MT 199, ¶ 24, 306 Mont. 270, ¶ 24, 32 P.3d 1257, ¶ 24 (citations omitted).

¶26 In addition to the language relied upon by the mother and quoted above, § 41-3-440, MCA, provides "[t]he court shall settle any dispute between the parties to an action regarding the appropriate placement." The statute was enacted in 2001 and has an effective date of October 1, 2001--after H.E. was placed in foster care, but before the date of the hearing.

¶27 Assuming *arguendo* that § 41-3-440, MCA, applies here, we conclude its requirements were met when the Department originally placed H.E. because no "dispute between the parties" over the appropriate placement existed at that time. The statutory

8

requirements were met again when the District Court settled the dispute regarding an appropriate placement for H.E.

¶28 H.E.'s need for placement when she was born to an incarcerated mother was urgent and immediate. In the absence of family members willing to intervene, the Department was obliged to provide protective services. *See* § 41-3-302, MCA (1999). The mother did not bring Helzer's name to the Department's attention before H.E. was placed, and Helzer did not contact the Department to arrange for a home study for approval as a foster parent. In fact, the mother did not formally object to the placement arranged by the Department until the permanent custody hearing, when H.E. was over six months old. All of these facts weigh against a conclusion that the mother showed good cause for a continuance.

¶29 Further, and in relation to "the furtherance of justice," the Department was obligated to form a permanency plan for H.E. incorporating the presumption that if a child has spent 15 of the last 22 months in foster care, that child's best interests will be served by termination of the parents' rights. *See* § 41-3-604(1), MCA. The mother was scheduled to be in prison for much longer than that, since she would be in federal custody for 60 months after she finished serving her state time. Even Frank, testifying on the mother's behalf, agreed it would be better for H.E. to stay where she was rather than be uprooted to the home of Helzer–who had never met H.E.--and then be uprooted again when the mother is released from prison.

9

¶30 We conclude the mother did not show good cause for a continuance and a continuance would not have been in the furtherance of justice. We hold that the District Court did not abuse its discretion when it implicitly denied the mother's motion for a continuance or an extension of temporary legal custody to allow the Department to conduct a home study.

¶31 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE
/S/ W. WILLIAM LEAPHART